**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| Brittany Gullo et al., | |
| Plaintiffs, | |
| vs. | Case No. 1:25-cv-00212 |
| City of Williston et al., | |
| Defendants. | |

**ORDER GRANTING MOTION TO DISMISS**

[¶ 1]   THIS MATTER comes before the Court upon a Motion to Dismiss for Failure to State a Claim filed by Defendants City of Williston, Jason Barten ("Barten"), and Alex Williams ("Williams") on November 21, 2025. Doc. No. 10. Plaintiffs Brittany Gullo, C.L.C.G., E.A.E.G., and E.L.A.G. through their Guardian ad Litem, Brittany Gullo, Kandi Layton, and Matthew Gullo (collectively, "Plaintiffs") filed a Response on December 19, 2025. Doc. No. 17. Defendants filed a Reply on January 19, 2026. Doc. No. 21. For the reasons described below, Defendants' Motion to Dismiss is **GRANTED**.

**BACKGROUND**

[¶ 2]   On July 23, 2024, at approximately 12:48 pm, City of Williston Police Department ("WPD") officers, including Barten and Williams, responded to a gun/weapon call near 1300 18th Street West, Apt. 35, Williston, North Dakota. Doc. No. 14, Exhibit A, at 00:01–00:40, Exhibit C, at 00:01–00:09. While en route to the scene, dispatch informed Barten the subject was a male "showing signs of mental instability." Doc. No. 14, Exhibit A, at 01:25–01:30. Barten was the first officer to arrive on the scene and encounter Matthew Gullo ("Gullo"). Id. at 03:35–03:40. Gullo

- 1 -

was holding a knife in his left hand while his right hand was hidden from view behind his back. Id. at 03:48–04:09. Barten drew his sidearm and shouted commands at Gullo to drop the knife four times, but he did not comply. Id. at 03:47–3:54. Barten warned Gullo would be shot if he failed to comply. Id. at 03:57–03:59. Barten then commanded Gullo not to move and to show his hidden hand six times. Id. at 04:00–04:11. Gullo did not comply with these commands either and instead started walking towards Barten and paused. Id. at 03:50–03:58; 4:00–4:02. After pausing, Gullo started walking towards Barten at a faster pace and paused again. Id. at 04:05–04:10. At this point, Gullo was within a significantly closer proximity to Barten and his patrol car. Doc. No. 14, Exhibit A, at 04:10–04:11, Exhibit C, at 3:10–03:11. Gullo then took a larger step towards Barten, at which point Barten immediately fired five shots at Gullo in quick succession without any discernable pause. Doc. No. 14, Exhibit A, at 04:11–04:13, Exhibit C, at 3:11–03:13. Gullo's larger step motion is visible on Barten's dashcam and bodycam footage. Doc. No. 14, Exhibit A, at 04:11, Exhibit C, at 03:11. The time between Barten's arrival on the scene and the shooting was approximately thirty-four seconds. Doc. No. 14, Exhibit A, at 03:37–04:11. The time between Gullo taking his first steps towards Barten and the shooting was approximately twenty-one seconds. Id. at 03:50–04:11. After Gullo was shot, Barten called for paramedics and continued to command Gullo to drop the knife while he was lying on his back on the ground, but Gullo did not comply. Doc. No. 14, Exhibit C, at 03:24–03:52.

[¶ 3]    Williams and WPD Officer Chase Cook were the next officers to arrive on the scene, with WPD Sargeant Justin Pelzl arriving shortly thereafter. Doc. No. 14, Exhibit D, at 03:29–03:40. The officers repeatedly commanded Gullo to drop the knife and warned additional force would be used if he failed to comply. Id. at 04:20–04:33. After Gullo failed to comply, Williams utilized a 40 mm launcher to fire two "sponge rounds" at Gullo's left hand which continued to grasp the

knife. Id. at 04:34–04:44. The first round missed. Id. The second round struck an undetermined location on Gullo's left arm but failed to dislodge the knife. Id. Multiple officers then slowly approached Gullo and Sargent Pelzl secured the knife. Id. at 05:08–05:30. Multiple officers immediately began providing emergency aid to Gullo after the knife was removed. Doc. No. 15, Exhibit B, at 0:16. An ambulance arrived roughly seven minutes later and left the scene with Gullo onboard roughly fourteen minutes afterwards. Id. at 07:23, 21:23. Gullo subsequently succumbed to his wounds.

[¶ 4]    Following the incident, Plaintiffs filed a Complaint against Defendants on August 29, 2025. Doc. No. 1. The Complaint contains seven claims consisting of 42 U.S.C. § 1983 and state law violations. Id. at 10–26. The claims include: (1) Fourth Amendment–Excessive Force (Barten, Williams, and Doe Officers), (2) Fourteenth Amendment–Denial of Familial Relationship (Barten, Williams, and Doe Officers), (3) Municipal Liability–Unconstitutional Custom, Practice, or Policy (City of Williston and Doe Supervisors), (4) Municipal Liability–Failure to Train (City of Williston and Doe Supervisors), (5) Municipal Liability–Ratification (City of Williston and Doe Supervisors), (6) Battery (Barten, Williams, and Doe Officers directly, and City of Williston and Doe Supervisors vicariously), and (7) Negligence (Barten, Williams, and Doe Officers directly, and City of Williston and Doe Supervisors vicariously). Defendants have moved to dismiss the Complaint asserting Plaintiffs lack standing to bring several of their claims and the individual officers are entitled to qualified immunity. Doc. Nos. 55–56.

<strong><u>DISCUSSION</u></strong>

### I.    Standing

[¶ 5]    Whether a plaintiff has standing to sue "is the threshold question in every federal case, determining the power of the court to entertain the suit." Steger v. Franco. Inc., 228 F.3d 889, 892

(8th Cir. 2000). "The question arises from Article III, § 2, of the United States Constitution, which limits the subject matter jurisdiction of federal courts to actual cases and controversies." McClain v. Am. Econ. Ins. Co., 424 F.3d 728, 731 (8th Cir. 2005). Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). The Supreme Court has defined the requirements for standing as follows:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Id. at 560–61 (citations omitted).

[¶ 6]   The plaintiff must assert an injury he personally suffered, not injuries suffered by others. See Glickert v. Loop Trolley Transp. Dev. Dist., 792 F.3d 876, 880–81 (8th Cir. 2015). The party invoking federal jurisdiction bears the burden of establishing the elements of standing. See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561.

[¶ 7]   In this case, Plaintiffs lack standing to assert the survival claims alleged in this action. For actions under Section 1983, when the injured party dies, the Eighth Circuit has held federal courts must apply state law in deciding who may bring the action on a decedent's behalf. Williams v. Bradshaw, 459 F.3d 846, 848 (8th Cir. 2006). Typically, state survival statutes govern who may bring a personal injury action on the decedent's behalf. See Andrews v. Neer, 253 F.3d 1052, 1056–57 ("Under 42 U.S.C. § 1988(a) (1994), [when an injured party dies] we look to state law to determine who is a proper plaintiff, as long as state law is not inconsistent with the Constitution

- 4 -

or federal law. Generally, state survival statutes govern survival of personal injury actions."). Under North Dakota law, the individual authorized to bring survival claims on a decedent's behalf is the personal representative of the decedent's estate. N.D.C.C. § 30.1-18-03(3) ("Except as to proceedings which do not survive the death of the decedent, a personal representative of a decedent domiciled in this state at the decedent's death has the same standing to sue and be sued in the courts of this state and the courts of any other jurisdiction as the decedent had immediately prior to death."); Goodleft v. Gullickson, 556 N.W.2d 303, 310 (N.D. 1996) ("A personal representative is authorized to bring a survival action.").

[¶ 8]   The difference between survival and wrongful death actions has been explained by the North Dakota Supreme Court.

> Wrongful death actions are intended to compensate the survivors of the deceased for the losses they have sustained as a result of a wrongful killing . . . . Survival statutes, on the other hand, are remedial in nature, and are intended to permit recovery by the representatives of the deceased for damages the deceased could have recovered had he lived. A survival action merely continues in existence an injured person's claim after death as an asset of his estate, while a wrongful death action is an entirely new cause of action for the benefit of those persons who bear a close relationship to the deceased and who have suffered injury as a result of his wrongful death.

Sheets v. Graco, 292 N.W.2d 63, 66–67 (N.D. 1980) (footnote and citations omitted).

[¶ 9]   Here, because Plaintiffs' Fourth Amendment excessive force and derivative municipal liability claims are for damages Gullo could have recovered had he survived his encounter with law enforcement, they are survival claims. Id. Plaintiffs seemingly acknowledge this reality in the Complaint since the damages sought are limited to "survival damages, including but not limited to pre-death pain and suffering, loss of life, and loss of enjoyment of life." Doc. No. 1, ¶¶ 55, 77, 86, 97. Accordingly, only a court-appointed personal representative for Gullo's estate has standing to assert these claims. See N.D.C.C. § 30.1-18-03(3); Goodleft, 556 N.W.2d at 310. This limitation

also applies to Plaintiffs' survival claims (for battery and negligence) under North Dakota law. Doc. No. 1, pp. 21–25.

[¶ 10]   Based on the evidence in the record, Brittany Gullo ("Ms. Gullo") has been appointed as personal representative for Gullo's estate. Doc. No. 22. Therefore, Ms. Gullo has standing to assert the survival claims on Gullo's behalf.[1] See N.D.C.C. § 30.1-18-03(3). By contrast, none of the other Plaintiffs have standing to bring the survival claims. In fact, because Gullo's children are minors, they are categorically prohibited from serving as personal representatives. N.D.C.C. § 30.1-13-03(6)(a) ("No person is qualified to serve as a personal representative who is . . . under the age of eighteen"). Likewise, since the personal representative's appointment is based on a set order of priority, Kandi Layton and Michael Gullo would only be able to seek appointment as personal representatives if Ms. Gullo is unable to serve in the future. See N.D.C.C. § 30.1-13-03(1) (outlining ranked priority for appointment of personal representative). Accordingly, C.L.C.G., E.A.E.G., E.L.A.G., Kandi Layton, and Matthew Gullo's survival claims in this action, including their Fourth Amendment excessive force claim, derivative municipal liability claims pertaining to the excessive force claim, and survival claims under North Dakota law (for battery and negligence), are **DISMISSED without prejudice** for lack of standing.

[¶ 11]   Similarly, C.L.C.G., E.A.E.G., E.L.A.G., Kandi Layton, and Matthew Gullo lack standing to assert the wrongful death claims under North Dakota law alleged in this action. Doc. No. 1, pp. 21–25. Under the North Dakota Century Code, Ms. Gullo, as Gullo's surviving wife, has priority to pursue any wrongful death claims relating to this matter. See N.D.C.C. § 32.1-21-03 (outlining

---

[1] Since Ms. Gullo took the time and effort needed to get appointed as Gullo's personal representative, the Court interprets the Notice of Estate of Decedent Matthew Gullo (Doc. No. 22) as Ms. Gullo stating her intent to assert the survival claims in her newly acquired capacity as personal representative of Gullo's estate.

priority for bringing wrongful death actions). This means Ms. Gullo, as Gullo's surviving wife, is the individual authorized to bring the wrongful death claims for the benefit of Gullo's family members, while all the other Plaintiffs lack standing to do so. See Goodleft, 556 N.W.2d at 306 ("A wrongful death action must be prosecuted by a person with statutory authority to bring the action . . . However, the person authorized to bring a wrongful death action does not have an absolute right to the damages recovered, and, instead, brings the action in a representative capacity for the exclusive benefit of the persons entitled to recover."). As a result, C.L.C.G., E.A.E.G., E.L.A.G., Kandi Layton, and Matthew Gullo's wrongful death claims (for battery and negligence) are **DISMISSED without prejudice** for lack of standing.

## II.    Motion to Dismiss

[¶ 12]  When ruling on a motion to dismiss for failure to state a claim, the Court must assume all material facts alleged in the Complaint are true. Davis v. Monroe Bd. of Educ., 526 U.S. 629, 633 (1999). A Complaint is liberally construed in favor of the plaintiff and all well-pleaded facts are taken as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, to survive a 12(b)(6) motion to dismiss, the Complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Facial plausibility requires facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Under this standard of plausibility, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. A dismissal is appropriate if the court determines beyond doubt that the plaintiff cannot provide a set of facts to support a claim that would entitle him to relief. Ulrich v. Pope Cnty., 715 F.3d 1054, 1058 (8th Cir. 2013). "Videos of an incident are necessarily embraced by the pleadings" and can be considered in ruling on a Rule 12 motion. Ching v. City of

Minneapolis, 73 F.4th 617, 621 (8th Cir. 2023). Plaintiff's interpretation of the facts should not be accepted "if they are 'blatantly contradicted' by video evidence." Waters v. Madson, 921 F.3d 725, 734 (8th Cir. 2019) (quoting Boude v. City of Raymore, 855 F.3d 930, 933 (8th Cir. 2017)).

### III.    Qualified Immunity

[¶ 13]   "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The determination of whether qualified immunity is applicable in given circumstances is one of 'objective reasonableness.'" Herts v. Smith, 345 F.3d 581, 585 (8th Cir. 2003). The issue is not "whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." Id. Courts use a two-step test to determine if an officer is entitled to qualified immunity, whether "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Pearson, 555 U.S. at 232. A "driving force behind the creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials be resolved prior to discovery." Id. at 231.

### a.    Step One: Excessive Force

[¶ 14]   The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. Amend. IV. An excessive force claim that "arises in the context of an arrest or investigatory stop of a free citizen . . . is most properly characterized as one invoking the

protections of the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 394 (1989). Since Ms. Gullo alleges excessive force was applied to Gullo in furtherance of his seizure, the Fourth Amendment applies to the excessive force claim.

[¶ 15]   Fourth Amendment excessive force claims are analyzed under the objective reasonableness standard. Graham, 490 U.S. at 396–97. "As in other Fourth Amendment contexts . . . the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. . . . [The test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Id. at 396–97 (citations omitted) (first quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985); and then quoting Johnson v. Glick, 481 F.2d 1028, 1033 (1973)).

[¶ 16]   Since individuals can only be held liable for their own conduct, Barten's and Williams's uses of force must be analyzed separately. See Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 806 (8th Cir. 2010) ("'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.' Section 1983 does not sanction tort by association." (quoting Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006)).

### i.  Barten's Use of Force Was Not Excessive

[¶ 17]  "The use of deadly force is reasonable only if the officer had probable cause to believe the suspect presented 'a threat of serious physical harm to the officer or others.'" Ching, 73 F.4th at 620 (quoting Partridge v. City of Benton, 929 F.3d 562, 565 (8th Cir. 2019)). In this case, video evidence establishes Barten had probable cause to believe Gullo posed a threat of serious physical harm to him when he used deadly force on Gullo. Id. When Barten arrived on the scene, Gullo was holding a knife in his left hand while his right hand was hidden behind his back. Doc. No. 14, Exhibit A, 03:28. Barten's dashcam footage shows Gullo holding his right hand behind his back the entire time leading up to Barten shooting Gullo. Id. at 03:28–04:11. From the time Barten arrived on the scene until he shot Gullo, Barten was the only officer on the scene. Id.

[¶ 18]  Given Gullo's failure to comply with Barten's repeated commands to drop the knife and show Barten his hidden hand, Barten's specific warning to Gullo that he would be shot if he failed to drop the knife, Gullo's approach towards Barten with the knife in hand despite these commands, and the larger step Gullo made within close proximity of Barten's location, Barten had probable cause to believe Gullo presented a serious risk to his life justifying the use of deadly force. Ching, 73 F.4th at 620 (quoting Partridge, 929 F.3d at 565). Gullo's bigger step towards Barten while in close proximity with the knife would lead a reasonable officer in Barten's position to believe Gullo was about to charge and attack Barten with the knife, potentially attack him with another weapon hidden in his left hand, or take some other aggressive action against Barten justifying his use of deadly force. See Graham, 490 U.S. at 397.

[¶ 19]  Objectively speaking, if Gullo was able to significantly close the gap in distance between himself and Barten by simply walking for several seconds (Doc. No. 14, Exhibit A, 04:02–04:10), then it is reasonable for an officer in Barten's position to believe Gullo could easily close the

remaining gap in an even shorter amount of time. This movement would have left Barten vulnerable to an attack with the knife and potentially an additional weapon hidden behind Gullo's back, especially with a more aggressive action. A reasonable officer in Barten's position could believe Gullo's larger step was preparation for a more aggressive action. Estate of Morgan v. Cook, 686 F.3d 494, 497 (8th Cir. 2012) (holding the officer's decision to shoot at the suspect was objectively reasonable because, among other facts, the suspect was holding a knife, failed to comply with the officer's direction to drop it, began moving toward the officer, and was within close proximity when the officer began shooting). Moreover, since Barten was alone on the scene when Gullo was approaching him, he did not have anyone who could help defend him if Gullo attacked. Under these circumstances, Barten was not obligated to wait and risk being attacked with the knife and potentially another hidden weapon. Id.

[¶ 20]  The tense and rapidly developing nature of this incident requiring split-second decisions on Barten's part provides additional reason to believe his use of force was reasonable under the circumstances, even if other alternatives may have been available in hindsight. See Graham, 490 U.S. at 397. Although Barten was informed by dispatch Gullo showed signs of mental instability, the Eighth Circuit has held "officers c[an] use deadly force to stop a person armed with a bladed weapon if they reasonably believed the person could kill or seriously injury others" and "mental illness or intoxication does not reduce the immediate and significant threat a suspect poses." Kong ex rel. Kong v. City of Burnsville, 960 F.3d 985, 993 (8th Cir. 2020). In this case, Gullo's actions would lead a reasonable officer in Barten's position to believe Gullo was an immediate and significant threat necessitating the use of deadly force even if Gullo was experiencing a mental health crisis. See, e.g., Cook, 686 F.3d at 498 (holding the officer acted reasonably in fatally shooting a man who appeared intoxicated because he approached the officer with a knife and

ignored repeated commands to drop the knife); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995) (holding officers were entitled to qualified immunity in fatal shooting of mentally ill person who initially had committed no crime or posed any threat because the individual attacked officers with an ax).

### ii.   Williams's Use of Force Was Not Excessive

[¶ 21]   While en route to the scene, Williams heard over the radio the suspect was not listening to Barten's commands and shots had been fired. Doc. No. 14, Exhibit D, 03:04–03:07. When Williams arrived on the scene, Gullo was lying on his back on the ground and the knife was visible in Gullo's left hand with the blade pointing upwards. Id. at 03:26. Williams was present when Barten and Sargent Pelzl issued multiple commands to Gullo to drop the knife, but he failed to comply. Id. at 03:28–03:45. Despite Sargant Pelzl warning Gullo additional force would be used against him if he failed to drop the knife, Gullo still failed to do so. Id. at 04:28–04:31. Under these circumstances, a reasonable officer could believe Gullo, knife still in hand and refusing to drop it, presented an ongoing threat to the physical safety of any officer who approached him. Accordingly, even if a better course of action may have been available in hindsight, Williams's attempts to disarm Gullo from a distance using the 40mm before officers approached Gullo to do the same were objectively reasonable. See Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996) ("It may appear, in the calm aftermath, that an officer could have taken a different course, but we do not hold the police to such a demanding standard.").

[¶ 22]   Because the video evidence establishes Barten's and Williams's uses of force were reasonable under the circumstances, it is beyond doubt that Ms. Gullo cannot provide a set of facts to support an excessive force claim against Barten and Williams. The excessive force claim against Barten and Williams is **DISMISSED with prejudice**.

### b.  Step Two: Clearly Established Law

[¶ 23]  Even if Barten's and/or Williams's actions were considered uses of excessive force, Ms. Gullo has failed to show it was clearly established a reasonable officer would have known Barten's and Williams's uses of force would constitute excessive force under the Fourth Amendment. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates the law." Thompson v. Monticello, 894 F.3d 993, 999 (8th Cir. 2018) (internal quotation marks omitted). Since qualified immunity is an affirmative defense, the defendant bears the burden of proof. Jones, 675 F.3d at 1161. To defeat an asserted qualified immunity defense, the plaintiff has the burden to show that the asserted right was clearly established at the time of the alleged violation. Quraishi v. St. Charles Cty., Missouri, 986 F.3d 831, 835 (8th Cir. 2021). While the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." Kisela v. Hughes, 584 U.S. 100, 104 (2018) (per curiam).

### i.  The Law Was Not Clearly Established at the Time of the Incident

[¶ 24]  Ms. Gullo references Ninth Circuit cases that are neither on point, because it was unclear if the suspect's conduct posed a threat to officers, nor binding on this Court. With regards to Eighth Circuit precedent, Ms. Gullo relies on cases that are distinguishable. In Nance v. Sammis, viewing the record in the light most favorable to the nonmoving parties, the Eighth Circuit assumed the gun was tucked into the waistband of the suspect's pants throughout the encounter, including when the officer shot him. 586 F.3d 604, 610–11. By contrast, the video evidence in this case establishes Gullo was holding the knife in his left hand before Barten shot him, after Barten shot him, and when Williams fired the sponge rounds to disarm him. Doc. No. 14, Exhibit A, 03:28–05:57. Additionally, Gullo was holding his right hand behind his back when Barten arrived at the scene

and up until the shooting, which a reasonable officer in Barten's position could fear meant Gullo had access to a hidden second weapon. Id. at 03:28–04:11.

[¶ 25]  Ms. Gullo's reliance on Ludwig v. Anderson to argue Gullo's speed of movement, distance from Barten, and mental instability all suggest Barten's use of force was unjustified is misplaced. 54 F.3d 465, 473 (8th Cir. 1995). The Eighth Circuit expressly stated in Kong ex rel. Kong that "[c]ases decided by [the appellate court] after Ludwig make clear that, at the time of [the suspect's] shooting, officers could use deadly force to stop a person armed with a bladed weapon if they reasonably believed the person could kill or seriously injury others" and "mental illness or intoxication does not reduce the immediate and significant threat a suspect poses." 960 F.3d at 993. As mentioned above, a reasonable officer in Barten's position would have believed Gullo's approach towards him with the knife and potentially another concealed weapon, even if Gullo was experiencing a mental health crisis, created a serious risk to his life justifying Barten's use of force. See Graham, 490 at 397. Since Gullo continued to hold the knife in an upwards direction while on the ground, the risk to officers remained when Williams used the sponge rounds. Id.

[¶ 26]  Ms. Gullo also cites to Roberts v. City of Omaha, 723 F.3d 966 (8th Cir. 2013). In that case, there was evidence to suggest the officer continued to fire shots after the suspect was subdued and no longer posed a threat. By contrast, in this case, the video evidence establishes Gullo was a serious threat to Barten's life when Barten fired and continued to be a threat when Williams fired the sponge rounds. Moreover, Barten's shots were fired in quick succession without a discernable pause that would allow him to reassess the situation. Ching, 73 F.4th at 619–21 (similar facts).

[¶ 27]  For Williams's use of force in particular, Ms. Gullo relies on Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012). However, the plaintiff in that case was an unarmed suspected misdemeanant who did not resist arrest, threaten the officer, attempt to run from him, or behave

aggressively towards him. Id. Gullo, conversely, was holding a weapon, approached an officer with the weapon, and refused to drop the weapon throughout his encounter with law enforcement. [¶ 28]  On the contrary, existing precedent at the time of the incident would have led a reasonable officer to believe Barten's and Williams's uses of force were reasonable under the circumstances and therefore legally sound. See, e.g., Ching, 73 F.4th at 621; Cook, 686 F.3d at 498; Schulz, 44 F.3d at 649. Because it was not clearly established at the time of the incident that Barten's and Williams's uses of force would constitute excessive force, even if Barten and/or Williams used excessive force, both officers would still be entitled to qualified immunity and dismissal of the excessive force claim. See Jones, 675 F.3d at 1161; Thompson, 894 F.3d at 999.

### IV.    Denial of Familial Relationship Claim

[¶ 29]  Plaintiffs also assert a substantive due process denial of familial relationship claim under the Fourteenth Amendment. Doc. No. 1, pp. 11–13. To prove a violation of the Fourteenth Amendment, Plaintiffs "must show (1) that [Defendants] violated one or more constitutional rights, and (2) that the conduct of [Defendants] was shocking to the contemporary conscience." See Stearns v. Wagner, 122 F.4th 699, 704 (8th Cir. 2024) (quoting Truong v. Hassan, 826 F.3d 627, 631 (8th Cir. 2016)). While "[p]roof of intent to harm is usually required . . . in some cases, proof of deliberate indifference . . . will satisfy the substantive due process threshold." Id. (quoting Truong, 829 F.3d at 631). "Only the most severe violations of individual rights that result from the 'brutal and inhumane abuse of official power'" rise to the "conscience-shocking level." White v. Smith, 696 F.3d 740, 757–58 (8th Cir. 2012) (quoting C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347, 591 F.3d 624, 634 (8th Cir. 2010)).

[¶ 30]  For a denial of familial relationship claim in particular, the plaintiff must allege the state action in question was intentionally directed at the familial relationship. See Harpole v. Arkansas

Dep't of Human Servs., 820 F.2d 923, 927–28 (8th Cir. 1987) ("Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct."); see also Reasonover v. St. Louis Cnty., 447 F.3d 569, 585 (8th Cir. 2006) (rejecting familial-association claim where plaintiff "present[ed] no evidence that defendants had an intent to interfere with the relationship between [plaintiff] and her daughter").

[¶ 31]  In this case, Plaintiffs fail to allege in the Complaint that the force used by Barten and Williams was intentionally directed at their familial relationship with Gullo. Doc. No. 1, pp. 11–13. This alone justifies dismissal of the claim. See Partridge, 929 F.3d at 568 ("Here, [the decedent's parents] did not allege in their complaint, or argue on appeal, that [the officer's] shooting was directed at their relationship with [their son]. This forecloses their claims.").

[¶ 32]  However, even if Plaintiffs amended the Complaint to include an allegation that the officers' uses of force were intentionally directed at their relationship with Gullo, the denial of familial relationship claim would still not be viable for several reasons. To start, because this case involves the application of force incident to a Fourth Amendment seizure, Fourth Amendment principles, not Fourteenth Amendment principles, apply. See Graham, 490 U.S. at 394 ("Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons against unreasonable seizures of the person."). Even if the Fourteenth Amendment applied, as mentioned above, a Fourteenth Amendment violation requires conduct that shocks the conscience. Stearns, 122 F.4th at 704. Here, the lawful use of force by officers does not qualify as a "brutal and inhumane abuse of official power" that shocks the conscience for Fourteenth Amendment purposes. C.N., 591 F.3d at 634.

- 16 -

Additionally, the Eighth Circuit has held "[o]nly a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Helseth v. Burch, 258 F.3d 867, 870 (8th Cir. 2001). The force applied by Barten and Williams was clearly related to their employment responsibilities as law enforcement officers. Therefore, their conduct could not shock the conscience for purposes of a Fourteenth Amendment violation. Id. (citing Lewis, 523 U.S. at 835).

[¶ 33]  Because it is beyond doubt that Plaintiffs cannot provide a set of facts to support their denial of familial relationship claim, it is **DISMISSED with prejudice**.

### V.      Derivative Municipal Liability Claims

[¶ 34]  Plaintiffs allege Defendant City of Williston is liable for unconstitutional custom, practice or policy, failure to train, and ratification of the officers' actions relating to Barten's and Williams's alleged uses of excessive force on Gullo. Doc. No. 1, ¶¶ 65–97. However, these claims are derivative of and dependent upon Ms. Gullo establishing a violation of Gullo's constitutional rights for the excessive force claim and the viability of Plaintiffs' denial of familial relationship claim. As the Eighth Circuit explained in Speer v. City of Wynne, neither a political subdivision nor its employees can be held liable in a 1983 action absent an actual violation of a plaintiff's constitutional rights. 276 F.3d 980, 986 (8th Cir. 2002); see also Schulz, 44 F.3d at 650 (8th Cir. 1995) ("[A] municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located."). Since the video evidence establishes neither Barten nor Williams used excessive force on Gullo, the municipal liability claims deriving from the excessive force claim fail. Likewise, since Plaintiffs have failed to allege a viable denial of familial relationship claim, Plaintiffs' municipal liability claims deriving from the familial relationship claim fail as well. Therefore, the municipal liability claims are **DISMISSED with prejudice**.

## VI.      Plaintiffs' Remaining State Law Claims

[¶ 35]   "[W]hen a district court has dismissed every federal claim . . . 'judicial economy convenience, fairness, and comity' will usually 'point toward declining to exercise jurisdiction over the remaining state-law claims.'" <u>McManemy v. Tierney</u>, 970 F.3d 1034, 1041 (8th Cir. 2020) (quoting <u>Wilson v. Miller</u>, 821 F.3d 963, 970–71 (8th Cir. 2016)). Because the Court has dismissed all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over the remaining wrongful death claims (for battery and negligence) under North Dakota law.

<u>CONCLUSION</u>

[¶ 36]   Based upon the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 10) as to all of Plaintiffs' claims. The Complaint (Doc. No. 1) is **DISMISSED with prejudice** pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

[¶ 37]   **IT IS SO ORDERED**.

DATED May 18, 2026.

Daniel M. Traynor, District Judge
United States District Court